MARC J. FAGEL (Cal. Bar No. 154425)
fagelm@sec.gov
MICHAEL S. DICKE (Cal. Bar No. 158187)
dickem@sec.gov
ROBERT L. MITCHELL (Cal. Bar No. 161354)
mitchellr@sec.gov
VICTOR HONG (Cal. Bar No. 165938)
hongv@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2600
San Francisco, California 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff,<br>v.<br>CRAIG T. JOLLY and QUEST HOLDINGS, INC.,<br>Defendants. | Case No. CV-09-38-EFS<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("Commission") alleges:

**SUMMARY OF THE ACTION**

1. This matter involves a Ponzi scheme funded through the issuance of unregistered securities. Between February 2006 and March 2008, Craig T. Jolly, through his Spokane, Washington-based company, Quest Holdings, Inc. ("Quest" or the "Company"), raised approximately $4 million from more than 200 investors. Jolly and Quest (together, "Defendants") raised these funds through the issuance of short-term securities promising ***monthly*** interest rates as high as 19.5 percent. Jolly claimed that Quest's business model was to be "active in the investment community and


SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
San Francisco, CA 94104

financial markets" and falsely assured investors that the Company had a reserve fund to ensure they would be repaid.

2. In reality, Defendants used only approximately one-third of all the investor funds they received to make investments on behalf of Quest, on which they suffered hundreds of thousands of dollars in trading losses. In addition, Jolly misappropriated at least $628,000 of investor funds for himself, which he used for his own stock trading and to pay for his vehicles, medical bills and other personal expenses. Thus, although Quest has repaid approximately $1.7 million to some investors, due to Quest's trading losses and Jolly's misappropriation, these payments were nothing more than a Ponzi scheme—they came not from Quest's earnings on its investment activities, but rather from funds provided by later investors.

3. In light of Quest's steep investment losses and Jolly's misappropriation of funds, Defendants knew, or were reckless in not knowing, that Quest could not generate sufficient income to pay the monthly returns Defendants promised to investors. Nevertheless, as late as February 2008, Jolly reassured investors that there was "no reason" why the program could not continue indefinitely. Despite these assurances, Jolly shuttered the business the following month, shortly after he learned of an investigation by the Commission staff into Quest's activities.

4. Jolly and Quest violated the antifraud provisions of the federal securities laws by misappropriating investor funds for personal use, and by making materially false and misleading statements and omissions in connection with the offer, purchase and sale of securities. In addition, Jolly and Quest violated the registration provisions of the federal securities laws by issuing securities on behalf of Quest without filing with the Commission a registration statement, which would have provided investors with important information about Quest's business and finances.

5. As a result of these violations, the Commission brings this action to require that Defendants account for all investor funds they received, disgorge all of

their ill-gotten gains plus prejudgment interest, pay civil money penalties, and be enjoined from future violations of the federal securities laws.

## JURISDICTION

6. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)]. This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d)(1) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Defendant, directly or indirectly, has made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

7. Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because defendants Jolly and Quest Holdings reside in, and a substantial portion of the conduct alleged in this complaint occurred within, the Eastern District of Washington.

## DEFENDANTS

8. Defendant Craig T. Jolly is a resident of Spokane, Washington. Jolly formed defendant Quest Holdings, Inc. and was its President, sole shareholder and sole employee. In testimony, as part of an investigation conducted by the Commission staff prior to the filing of this lawsuit, Jolly asserted his Fifth Amendment privilege against self-incrimination with respect to questions about his use of Quest investor funds, the destruction of documents relating to Quest, and the location of certain of his and Quest's financial accounts.

9. Defendant Quest Holdings, Inc. was incorporated in Nevada in February 2006 and operated out of Jolly's home in Spokane, Washington. Quest solicited investor funds primarily through a website it controlled, called EarnByLoaning (or

"EBL"). Investors forwarded funds to Quest through multiple financial institutions located in at least two states.

## FACTUAL ALLEGATIONS

### A. Quest and Jolly Raised Approximately $4 Million Between February 2006 and March 2008

10. From February 2006 through March 2008, Quest and Jolly raised approximately $4 million from more than 200 investors in at least 37 states and 21 countries. Defendants offered Quest securities in the form of a purported loan program in which members loaned money to Quest and earned interest as set forth in a document described as a Lenders Agreement.

11. Although the terms varied, the loans generally promised simple interest ranging from 6% to 19.5% ***per month*** for periods from 30 to one year. In addition, Quest promised a 5% commission to any investor who brought in new investors who loaned Quest money. Thus, in the first year of a referred investor's relationship, Quest could be required to pay interest totaling as much as 239% ((19.5% x 12) + 5%) of the loaned amount.

12. Defendants offered and sold Quest securities, and raised funds, through Quest's website EarnByLoaning, which described Quest's business and which allowed investors to transfer funds and view their purported account balances. The website claimed: "There is one MAJOR difference between investing in other programs and lending to EBL. With EBL, we return your principle [sic] along with the rate of interest set in your contract. We are obligated to because this is a loan, it's not a blind investment. Hence, the required contract backed by the U.S. judicial system." [sic]

13. Defendants offered Quest securities without filing a registration statement with the Commission and without having a registration statement in effect as to such securities, as required by law. Had Quest filed such a registration statement, investors

would have had access to important information about Quest's business and its finances before they invested with the Company.

14. Quest and Jolly used the instrumentalities of interstate commerce to advance their scheme. At all relevant times, Quest's program was available to the investing public through its EarnByLoaning website. In addition, some investors learned of the Company on Internet discussion forums touting various so-called high-yield investment programs such as Quest's. Quest also held conference calls for investors and also provided a template for investors to create their own websites to help market the Company. Defendants collected investor money through financial institutions located in at least two states.

15. As Quest's sole officer, director and employee, Jolly closely ran the Company's operations. In testimony during the Commission staff's investigation, Jolly admitted that he "manage[d] all day to day functions of the business, banking, trading [and] investments, just pretty much everything integral to day to day operations." Jolly also had signature authority on the Company's bank and brokerage accounts, determined the rates offered by the Company and controlled the EBL website's content. In fact, Jolly boasted to investors of his intimate knowledge of the Company's finances. According to an audio recording of a February 2008 conference call held with Quest investors, Jolly stated, "The reality is I see all the money and I see it all the time. And it stares at me every day of the week. And I know what's coming and what's going. And what it takes to keep it circulating and to make the returns and everything else."

16. Quest investors forwarded funds to the Company through its accounts at multiple financial institutions. However, rather than segregate each investor's funds into a separate account, Defendants treated investor funds as a common pool. As Jolly testified during the Commission staff's investigation, Quest's investors "don't individually earn on their specific money. Nobody in there actually has a block of

money where they loan $10,000 and the company specifically went out to that $10,000, invested it on their behalf and paid them back."

**B. Defendants Claimed that Quest Was Active in the Investment Community and Financial Markets**

17. In testimony during the Commission staff's investigation, Jolly claimed that his business plan was to "borrow money, invest the money, make returns, [and] pay the loans off." Similarly, when asked in an online interview by a potential investor to describe what Quest Holdings does to generate returns Jolly responded, "We are active in the investment community and financial markets." At another time, Quest disclosed on its EBL website's discussion forum that it trades in "Small Caps/OTC."

18. However, in other communications with investors, Jolly claimed that he could not tell investors how he would invest the funds because doing so would purportedly transform the instruments into securities and subject Quest to regulation by the Commission. Similarly, in a conference call with investors on or about February 4, 2008, Jolly claimed that the Commission would not investigate his activities: "The other thing that people have to understand, too, is that the SEC is a very small organization and it governs the markets in the United States .... The SEC has no time or interest in wasting their day looking around for somebody like us[.]"

**C. Jolly Misappropriated Funds, and Defendants Operated a Ponzi Scheme and Lied to Investors**

19. As discussed below, of the approximately $4 million of investor funds that Defendants raised, they used only a fraction to make investments on behalf of Quest, on which Quest suffered substantial trading losses. In addition, Jolly misappropriated at least $628,000 in investor funds for his own use. Finally, Defendants used at least $1.7 million in investor funds to run a Ponzi scheme.

20. From March 2006 through May 2008, Defendants deposited approximately $1.36 million in investor funds into a brokerage account in Quest's name at E-Trade Securities ("E-Trade"). As of May 2008, Quest had suffered net

realized and unrealized losses of approximately $729,000 from trades in its E-Trade account. The E-Trade account was the only brokerage account that Quest maintained for investing funds it received through its loan program.

21. In addition to the trading losses Quest suffered, Jolly misappropriated at least $628,000 in investor funds. Jolly transferred $300,000 from Quest's bank account to his personal brokerage accounts in September and October 2007. Jolly also used Quest's company financial accounts for his own use to pay personal expenses totaling at least $328,000. Among other things, Jolly used Quest investor funds to pay for his all-terrain vehicle, a tractor rental, medical bills related to his hand injury, car payments on his Toyota Tundra truck and payments for tools and property supplies. During testimony in the investigation by the Commission's staff, Jolly asserted his Fifth Amendment privilege against self-incrimination and refused to answer questions regarding his use of investor funds.

22. Jolly falsely told investors that he was not operating a Ponzi scheme and was not using investor funds to repay other investors. Jolly also failed to disclose to investors that he was converting a material percentage of their funds to his personal use.

23. As a result of Quest's trading losses and Jolly's misappropriation, Quest could not generate sufficient income to meet its obligations to investors. Instead, Defendants ran a Ponzi scheme, using funds obtained from later investors to meet Quest's payment obligations to earlier investors. From June 2006 to April 2008, Defendants used at least $1.7 million in investor funds to make payments to earlier investors.

24. In order to induce people to invest with Quest, Defendants lied to investors and omitted material information regarding Quest's business and finances. Among other things, throughout the period of Quest's operations Jolly falsely claimed that Quest was generating sufficient returns to repay investors. For example, during a

conference call with investors as late as February 4, 2008, Jolly stated that the program "can run for any amount of time" and that there was "[n]o reason for it not to continue indefinitely." In fact, as described above, as a result of Jolly's misappropriation of investor funds and Quest's trading losses, Quest's returns did not approach the levels needed to repay investors.

25. Further, Jolly falsely told investors that Quest maintained a reserve fund that was "building all the time."

26. The Defendants, and each of them, knew, or were reckless in not knowing, that their misrepresentations and omissions of fact regarding Quest's business and its finances-- including but not limited to Quest's use of investor funds to repay earlier investors, Jolly's misappropriation of investor funds, and the purported existence of a Quest reserve fund--were materially false and misleading.

### D. After Learning of the Commission Staff's Investigation, Jolly Shut Down the Quest Website And Transferred Some Investor Funds Out of the Country

27. In early March 2008, a Quest investor informed Jolly that he had been contacted by the Commission staff as part of an investigation concerning Quest. One week later, on or about March 14, 2008, Jolly shut down Quest's EarnByLoaning website. On or about March 15, 2008, Jolly sent an e-mail to his investors stating, among other things, that "Quest Holdings, Inc. [sic] Due to unforeseen circumstances needs to discontinue operations. We feel this is in the best interest of all parties."

28. That same month, between March 14 and March 18, 2008, Jolly transferred at least $100,000 in Quest investor funds to Panama and then to Belize, purportedly to buy an undeveloped real estate project in Belize.

///

///

///

///

## FIRST CLAIM FOR RELIEF

### (Violations of Section 5(a) of the Securities Act)

29. The Commission hereby incorporates and realleges here paragraphs 1 through 28, above.

30. By engaging in the acts and conduct alleged above, Jolly and Quest Holdings, and each of them, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities through the use or medium of a prospectus or otherwise when no registration statement had been filed or was in effect as to such securities and no exemption from registration was available.

31. By reason of the foregoing, Jolly and Quest Holdings, and each of them, have violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SECOND CLAIM FOR RELIEF

### (Violations of Section 17(a) of the Securities Act)

32. The Commission hereby incorporates and realleges here paragraphs 1 through 28, above.

33. By engaging in the acts and conduct alleged above, Jolly and Quest Holdings, and each of them, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) with scienter employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

34. By reason of the foregoing, Defendants have violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)**

35. The Commission hereby incorporates and realleges here paragraphs 1 through 28, above.

36. Defendants Jolly and Quest Holdings, and each of them, have, by engaging in the conduct set forth above, directly or indirectly, by use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, in connection with the purchase or sale of securities.

37. By reason of the foregoing, defendant has directly or indirectly violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

I.

Enjoin and restrain defendants Jolly and Quest Holdings, from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Sections 5(a), 5(c) and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c) and 77q(a).

II.

Order defendants Jolly and Quest Holdings, and each of them, to provide an accounting of all Quest investor funds Defendants received and how those funds were used.

III.

Order defendants Jolly and Quest Holdings to disgorge ill-gotten gains in an amount according to proof, plus prejudgment interest thereon.

IV.

Order defendants Jolly and Quest Holdings, and all of their agents, employees, officers, and all others acting in concert with them, to preserve all assets relating to Quest during the pendency of this litigation, for the benefit of defrauded Quest investors.

V.

Order defendants Jolly and Quest Holdings, and each of them, to pay civil money penalties pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

///

///

///

VII.

Grant such other and further relief as this Court may deem just, equitable, and necessary.

Dated: February 9, 2009

Respectfully submitted:

By: [signature]
Robert L. Mitchell
Victor Hong

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION